IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 26, 2014

## JIMMIE R. ROBINSON, SR. v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Sevier County**
**No. 17445-II    Richard R. Vance, Judge**

_____

**No. E2013-01163-CCA-R3-PC - Filed March 31, 2014**

_____

Jimmie R. Robinson, Sr., ("the Petitioner") pleaded guilty to second degree murder after he shot and killed his son-in-law. The plea agreement provided for a sentence of seventeen years and six months in prison. The Petitioner subsequently filed a petition for post-conviction relief on the grounds that his guilty plea was the product of ineffective assistance of counsel and that his plea was constitutionally infirm. After an evidentiary hearing, the post-conviction court denied relief, and this appeal followed. Upon our thorough review of the record and applicable law, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment**
**of the Circuit Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN and ROGER A. PAGE, JJ., joined.

James R. Hickman, Jr., Sevierville, Tennessee, for the appellant, Jimmie R. Robinson, Sr.

Robert E. Cooper, Jr., Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; James B. Dunn, District Attorney General; and George Ioannides, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Petitioner pleaded guilty on June 23, 2011, to second degree murder as a lesser-included offense to the charged offense of first degree premeditated murder. At the plea hearing, the State set forth the factual basis for the plea as follows:

[T]he facts in this case the State would expect to prove are the following, first through Leah Brackins, the mother of the victim, James Jason Hicks. He was born in 1979 and grew up and in 2003 met Wendy Robinson, the [Petitioner's] daughter.

Thereafter, he and Wendy had . . . three children. Ethan, born August 24, 2005, Samuel and Jake are twins born April 9, 2007. Subsequently, there was an order of protection filed by Ms. Robinson against the victim. Subsequently he filed a divorce. That case was pending and was a hotly contested divorce and custody dispute. That case was proceeding in both this court and the juvenile court until April 8 and 9 of 2009 when Judge Strand ordered that the victim, who had been separated from his children would be given the right to start . . . visitation.

Thereafter, on April 19, according to the testimony of Ms. Brackins – well, actually on the 20th, she had went [sic] to her son's house and found him killed in his carport and driveway.

Thereafter, Detectives Brown and Bush, along with Lieutenant Hinson of the Sevierville Police Department conducted an investigation. During the course of their investigation the body was autopsied. Dr. Steven Cogswell, who was the medical examiner at UT Hospital would testify that the victim died from three gunshot wounds to the head, two on the right side and one on the back left.

The detectives investigated. They were able to locate several witnesses, including Marlene Forrester, and she would testify that the [Petitioner] made statements that he intended to ensure that the children would never see their father again. Allen Adams and Don McFalls would further testify that [the Petitioner] made statements along those lines. Mr. McFalls discovered a gun on the morning of April 20th in his car and it was arranged that that would be destroyed by him and that was in fact done and that would be his immunized testimony in this case.

The detectives located projectiles, or a projectile. That was tested and compared with the projectiles found in the victim, and they matched.

Taking all this information, the detectives were able to locate [the Petitioner]. [The Petitioner] made statements to them after being Mirandized

implicating himself in this killing. As the Court is aware from a motions hearing, he stated his reasons for doing that.[1]

At the evidentiary hearing on the Petitioner's claim for post-conviction relief, the Petitioner testified that he retained trial counsel to assist him in defending against the first degree murder charge that the State brought against him. He retained trial counsel no more than two months prior to the scheduled trial date. He thought they met approximately five times. After the first several meetings, trial counsel claimed to have developed "a strategy that was not going to fail." The Petitioner testified that trial counsel wanted to conduct the case in a manner so as to allow the jury to conclude that the Petitioner's daughter had shot and killed the victim. The Petitioner refused to cooperate with this strategy "because it was not true." The Petitioner also was dissatisfied with trial counsel's attitude about the abuse that the Petitioner claimed that the victim had inflicted on the Petitioner's grandchild.

The Petitioner testified that, about six days before trial, there was a hearing that impacted negatively the Petitioner's defense of necessity. After the hearing, trial counsel told the Petitioner that he would have to take a plea bargain or he would "never get out of prison." Subsequently, they went to court, and the Petitioner signed the plea agreement at the podium. The Petitioner did not recall reviewing the agreement with trial counsel prior to signing it. The Petitioner did not recall trial counsel's explaining second degree murder to him. He testified that trial counsel "always told me it [the facts of the case as related by the Petitioner] rose at best to manslaughter, two to six years." However, trial counsel did not explain the elements of manslaughter to the Petitioner, either.

The Petitioner recalled telling trial counsel that, right before the Petitioner killed the victim, the Petitioner's grandson asked him "if he would have to put [the victim's] pee-pee in his mouth again." According to the Petitioner, trial counsel's response to this reported conversation was, "that's too F-ing pat."

On cross-examination, the Petitioner acknowledged that he was not indicted and arrested for the killing of the victim until almost one year after he killed the victim. In the meantime, he had told the police that "there might be some bikers that had it out for" the victim. Ultimately, however, he confessed to the killing.

The Petitioner stated that he was sixty-seven years old at the time he entered his plea. He knew at the time he went to court on the day of the plea that he was going to plead guilty to second degree murder and that he was going to be sentenced to seventeen and one-half

---

[1] We have deleted the numerous statements of "Your Honor" from this recitation.

years. He knew that he would be going to prison that day. He did not remember any specifics from the plea hearing because he was "in a fog."

Crystal Piarrot testified that, during the State's prosecution of the Petitioner, she had been employed with the Department of Children's Services ("DCS") as a child protective services investigator. She investigated a matter involving a child that was relevant to the Petitioner's prosecution. Trial counsel did not interview her.

On cross-examination, Piarrot stated that the victim was never charged with a crime.

On re-direct examination, she stated that a detective had been assigned to the case to determine if the victim should have been charged.

Trial counsel testified that he became licensed to practice law in 1996 and that his practice consisted solely of criminal defense work. He had significant trial experience with first degree murder cases. In this case, the State turned over extensive discovery to him. The discovery included materials about the divorce between the victim and the Petitioner's daughter and about the allegations of child abuse. Trial counsel acknowledged that he did not talk to Piarrot, explaining that he had two reasons for not doing so. First, he did not believe that she would be allowed to testify. Second, he had been "led to believe there was a criminal history there, and that's not a good witness." Trial counsel, however, did have access to Piarrot's records.

Trial counsel stated that his initial trial strategy was "heat of passion" resulting from the Petitioner's discovery that the victim had abused one of the Petitioner's grandsons. However, trial counsel became aware of several significant weaknesses with this strategy. First, over one year had elapsed between the Petitioner's discovery of the alleged abuse and the shooting. Second, "the way the shooting took place," i.e., the way the Petitioner hid, waited, and then shot the victim while the victim was talking on the phone. Third, the Petitioner previously had arranged for a third person to destroy the murder weapon, and the third person had admitted to doing so after the shooting. Fourth, the Petitioner initially told police that someone else was responsible for the killing. Finally, another significant problem was the Petitioner's videotaped statement to the police in which he was "cool, calm, and collected" and in which he told the police that he committed the crime because he was "sick of the system." In light of these difficulties with the initial strategy, trial counsel discussed with the Petitioner an alternate strategy of giving the jury an opportunity to consider that the Petitioner had confessed in order to protect his daughter, whom witnesses had described as very distraught before the murder and then, before the murder was discovered, was described as having undergone a "remarkable change in her demeanor" and who was saying, "don't worry, it's all going to be okay." The Petitioner and his family rejected this approach.

-4-

Trial counsel testified that he explained the elements of first degree premeditated murder to the Petitioner. Trial counsel stated that the facts as relayed by the Petitioner to him constituted premeditation: "we have a one to two hour lying in the dark watching the victim, contemplating shooting his head off. . . . And, secondly, having gone ahead of time to a friend and saying if I do this I need to get rid of the gun and then doing that." Trial counsel also explained second degree murder and voluntary manslaughter to the Petitioner. Trial counsel also explained the penalties for each of these crimes.

After the Petitioner rejected the defense strategy of blaming the Petitioner's daughter, trial counsel returned to the necessity of the Petitioner's testifying about why he shot and killed the victim. Trial counsel remained concerned that the jury would convict the Petitioner of premeditated murder because the State had uncontroverted proof that there had been no confrontation between the Petitioner and the victim before the Petitioner shot the victim multiple times in the head. Trial counsel also referred to the videotaped police interview in which the Petitioner confessed, testifying that "[t]he [Petitioner] himself admitted standing there in the dark waiting an hour or two and then shooting him."

Shortly before trial, there was a hearing about (1) whether the Petitioner would be able to testify about what he believed had happened to his grandchildren and why he killed the victim and (2) whether the State would be able to impeach the Petitioner with his prior convictions. Trial counsel testified that the trial court ruled in the Petitioner's favor as to both issues. Trial counsel also stated that the trial court's ruling allowed him to strike a favorable plea bargain for the Petitioner. In discussing the plea offer with the Petitioner and the Petitioner's family, he told the Petitioner that, if they went to trial, they would lose. He testified,

> I told them, if the jury follows the law, it will be first degree [murder]. If we can convince one or two or three, they might trade down and we'll get second. If we get second, you're going to get twenty-five. You are going to get twenty-five years. . . . The Court is going to hammer you. You have a prior record. The deception for a year, the trying to blame other people. . . . [T]he use of a firearm.

The ultimate sentence agreed to was based on the possibility that the Petitioner would serve fifteen years and then be able to get out and see his grandchildren. Trial counsel discussed the sentence in detail with the Petitioner, and the Petitioner agreed to the plea bargain. The next day, at the plea hearing, the Petitioner was, according to trial counsel, "very strong, showed a lot of character, back straight, spoke up, went forward with dignity, I thought. Conducted himself very, very well." Trial counsel testified that he went over the written plea agreement with the Petitioner before the hearing. He also testified that, if the Petitioner had changed his mind, trial counsel was ready to go to trial.

On cross-examination, trial counsel stated that he did not interview any of the State's witnesses, nor did he have an investigator interview any of them. He stated, "there was no reason to. I knew what had happened from my own client." He also had the State's witnesses' statements, which conformed to the facts as he knew them. He did not seek a change of venue, in spite of the Petitioner's request, because he did not think it would be granted.

When asked if the Petitioner informed him about an event with his grandchild that was closer in proximity to the shooting and that would have been relevant to a heat-of-passion defense, trial counsel responded as follows:

> I recall telling [the Petitioner] that if he had shot him within three or four days I would walk him on probation. I remember telling him that. And I remember telling him that there was a real, real problem, and the problem was that it appeared that they were losing the court battle for custody and that when they got word they were going to lose, that that's when this all started to happen. And I remember telling him . . . that something has to drive you in the heat of passion. Okay? And up until then his entire conversations were about the system and the judges and the this and the that. There was never any mention of what [the grandson] had said recently. When I directly pointed out that that was going to be a real problem, the next day he came and said, I remember [my grandson] told me, I don't want to go there because I'm afraid he's going to make me, you know, put his pee-pee in my mouth or something like that. I didn't believe that for a second. He manufactured that because he realized I had just told him we didn't have a trigger. And so the next day he provided me the trigger.

Piarrot was re-called in rebuttal, and she testified that she voluntarily resigned from the DCS in April 2011. She stated that she resigned because she and her husband were leaving Tennessee. She denied that she ever had been charged with anything criminal.

The Petitioner also testified in rebuttal. He stated that he had watched the victim for "maybe five [minutes], at the most" before shooting him. He reiterated that his grandson had spoken to him about his fears of his father, the victim, three hours before the shooting and that the Petitioner had so informed trial counsel.

At the conclusion of the hearing, the post-conviction court ruled from the bench as follows:

> [The Petitioner's] trial counsel . . . is a highly qualified and experienced defense attorney. By his account, he has actually taken to jury trial over thirty-

five first degree murder cases and represented defendants in many, many others that did not go to trial. In this case, he was diligent in obtaining discovery materials, spent considerable time consulting with [the Petitioner], explored all possible avenues of defense, investigated the case, and was fully prepared to take the case to trial. He was faced with a difficult task, in that the evidence would have shown that the victim, Mr. Jason Hicks, was killed by three gunshot wounds to the head and that [the Petitioner] had admitted to shooting from essentially an ambush position. [The Petitioner] had made a very detailed videotaped confession of the offense.

On June 23rd, 2011, [the Petitioner] appeared in court and entered a plea of guilty to second degree murder and received an agreed sentence of seventeen and a half years. I refer to the transcript of that hearing, which has been filed here as Exhibit No. 1. This transcript shows that [the Petitioner] was fully advised of his rights by the Court. He clearly understood those rights and voluntarily, knowingly and intelligently waived his right to a jury trial and entered his plea of guilty. When asked if satisfied with [trial counsel's] representation, he replied, quote, absolutely, Your Honor, I am. He was given the opportunity to ask questions and make statements. He did go on to say in that hearing, again, this is in the transcript, a big part of why I am doing this is this needs to end for my family and for the other family. It's gone on too long and I'm sorry that all this had to happen. I'm just Grandpa. That's all I am. Whatever comes, comes. And I respect this Court, I respect you, and I believe this has all been honest.

Besides stating his personal motivation for entering the plea, this shows that he was very clear, he understood all of the circumstances, he understood the procedure, and was making a voluntarily and intelligently made decision. [The Petitioner] was fully informed and advised by counsel of the ramifications of the plea agreement. Counsel met with family members. [The Petitioner] met with his family members. He considered the plea offer overnight and then appeared in court the next day.

The Court must find that he was fully advised, fully informed by counsel, who had fully prepared, adequately prepared, and that the plea was his own voluntary decision to waive his right to a trial by jury and proceed with the plea agreement. The Court further finds [trial counsel] was thorough. He prepared himself fully for trial, was well-versed with all of the issues, considered all possible trial strategies, even some that were rejected by [the Petitioner], and in all respects performed well above the standards of reasonably effective defense counsel, and was in no way deficient. Thus, [the]

[P]etitioner has failed to carry his burden of proof on the first prong of the two-prong test, and the Court must conclude to the contrary that [trial counsel's] representation was at the highest level of standards of defense counsel.

Having failed to meet the first prong of the test, the Court need not address the second part, but if I did, it's clear that [the Petitioner] was in no way prejudiced in this case. Counsel made no errors. His advice was spot on. [The Petitioner] faced a potential life sentence. The evidence against him was overwhelming. [The Petitioner] served himself well by entering into and accepting the plea agreement.

It is therefore the finding of this Court that [the Petitioner] has failed to carry his burden of proof, that his plea of guilt was knowingly and voluntarily made, that his counsel was very effective and met the highest standard of his profession, and therefore the petition for post-conviction relief is hereby dismissed.

In this appeal, the Petitioner argues that the post-conviction court erred in denying relief, contending that trial counsel was ineffective because he "promoted a dishonest defense," did not pursue the defense of necessity, failed to prepare for trial, and coerced the Petitioner into pleading guilty. He also argues that, due to trial counsel's deficient performance, his plea was not knowing, voluntary, or intelligent. Finally, the Petitioner, acting pro se, filed an amendment to his petition several months after the evidentiary hearing in which he contends that his plea was constitutionally infirm because the trial court did not inform him about the elements of the offenses of first degree murder and second degree murder. The State urges us to affirm the post-conviction court's ruling.

**Standard of Review**

Relief pursuant to a post-conviction proceeding is available only where the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). To prevail on a post-conviction claim of a constitutional violation, the petitioner must prove his or her allegations of fact by "clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2006). See Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This Court will not overturn a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual

issues presented by the evidence.  Momon, 18 S.W.3d at 156.  With respect to issues raising mixed questions of law and fact, however, including claims of ineffective assistance of counsel, our review is de novo with no presumption of correctness.  See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

## Analysis

### *Ineffective Assistance of Counsel*

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel at trial.[2]  Both the United States Supreme Court and the Tennessee Supreme Court have recognized that this right is to "reasonably effective" assistance, which is assistance that falls "within the range of competence demanded of attorneys in criminal cases."  Strickland v. Washington, 466 U.S. 668, 687 (1984); see also Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).  The deprivation of effective assistance of counsel at trial presents a claim cognizable under Tennessee's Post-Conviction Procedure Act.  See Tenn. Code Ann. § 40-30-103; Pylant, 263 S.W.3d at 868.

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish two prongs:  (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense.  See Strickland, 466 U.S. at 687; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).  The petitioner's failure to establish either prong is fatal to his or her claim of ineffective assistance of counsel.  Goad, 938 S.W.2d at 370.  Accordingly, if we determine that either prong is not satisfied, we need not consider the other prong.  Id.

To establish the first prong of deficient performance, the petitioner must demonstrate that his lawyer's "acts or omissions were so serious as to fall below an objective standard of 'reasonableness under prevailing professional norms.'"  Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (quoting Strickland, 466 U.S. at 688).  Our Supreme Court has explained that:

> [T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance.  It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence.  Defense counsel must perform at least as well as a lawyer with ordinary

---

[2] The Sixth Amendment right to counsel is applicable to the States through the Fourteenth Amendment to the United States Constitution.  See Gideon v. Wainwright, 372 U.S. 335, 342 (1963); State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

Baxter, 523 S.W.2d at 934-35 (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974)).

When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006)  (citing Strickland, 466 U.S. at 689).  Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689).  We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result.  Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991).  We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish a "reasonable probability that but for counsel's errors the result of the proceeding would have been different." Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694).  In the context of a guilty plea, our analysis of this prong

focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process.  In other words, in order to satisfy the "prejudice" requirement, the [petitioner] must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.

Hill v. Lockhart, 474 U.S. 52, 59 (1985).  See also Calvert v. State, 342 S.W.3d 477, 486 (Tenn. 2011).

In this case, the Petitioner contends that trial counsel was ineffective because he "promoted a dishonest defense" instead of preparing to defend the Petitioner on the basis that the Petitioner killed the victim in order to prevent the victim from abusing the Petitioner's grandson.  Trial counsel explained that the Petitioner's claim that he killed the victim to protect his grandchild would likely not convince a jury because of the amount of time that had passed between the Petitioner learning of the allegations of abuse and the murder, the Petitioner's arrangements to destroy the murder weapon, the manner of the killing, the

-10-

Petitioner's initial attempts to blame others, and the Petitioner's explanation to the police that he had killed the victim because he was "sick of the system." Trial counsel was very concerned that the proof supported the State's theory of first degree premeditated murder and that the Petitioner would be convicted as charged. Clearly, the post-conviction court accredited trial counsel's testimony in this regard and concluded that trial counsel was very effective in obtaining a plea bargain for the Petitioner.

We agree. The Petitioner has failed to establish by clear and convincing evidence that trial counsel was deficient in his trial preparation and in seeking a plea bargain for second degree murder. The Petitioner is entitled to no relief on this basis.[3]

*Validity of Guilty Plea*

The Petitioner also contends that his plea was not voluntary and knowing because trial counsel coerced him into taking the plea and did not adequately explain the plea to him. The post-conviction court concluded that the Petitioner's plea met constitutional muster.

To be valid, a guilty plea must be entered knowingly, voluntarily, and intelligently. See Boykin v. Alabama, 395 U.S. 238, 242-44 (1969); State v. Mackey, 553 S.W.2d 337, 340 (Tenn.1977), superseded on other grounds by Tenn. R. of Crim. P. 37(b) and Tenn. R. of App. P. 3(b). A plea passes constitutional muster when the defendant understands both what the plea connotes and its consequences, Blankenship v. State, 858 S.W.2d 897, 904

---

[3] We note that the defense of necessity provides that "conduct is justified, if: (1) The person reasonably believes the conduct is immediately necessary to avoid imminent harm; and (2) The desirability and urgency of avoiding the harm clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness." Tenn. Code Ann. § 39-11-609 (2006).

Additionally, the defense of defense of third person, on the date of this incident, provided as follows:

> A person is justified in threatening or using force against another to protect a third person, if:
>
> (1) Under the circumstances as the person reasonably believes them to be, the person would be justified under § 39-11-611 [setting forth the defense of self-defense] in threatening or using force to protect against the use or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected; and
>
> (2) The person reasonably believes that the intervention is immediately necessary to protect the third person.

Id. § 39-11-612 (2006). The Petitioner failed to establish the factual predicates for either of these defenses.

(Tenn.1993) (citing <u>Boykin</u>, 395 U.S. at 244), and makes a voluntary and intelligent choice from the alternative courses of action available to plead guilty, <u>Jaco v. State</u>, 120 S.W.3d 828, 831 (Tenn.2003) (citing <u>North Carolina v. Alford</u>, 400 U.S. 25, 31 (1970)).  In <u>Mackey</u>, our supreme court set forth the procedure that a trial court should follow when accepting a guilty plea in order to ensure that a defendant's plea is knowing, voluntary, and intelligent. 553 S.W.2d at 341; <u>see also</u> Tenn. R. Crim. P. 11(b). A trial court must "substantially" comply with this procedure.  <u>State v. Newsome</u>, 778 S.W.2d 34, 38 (Tenn.1989).

The record, including the transcript of the plea hearing, supports the post-conviction court's ruling that the Petitioner entered his plea knowingly, voluntarily, and intelligently. Trial counsel, whose testimony the post-conviction court clearly accredited, testified that he reviewed the plea bargain offer with the Petitioner and explained the consequences of the deal.  Trial counsel also advised the Petitioner of what he considered to be the likely consequence of a trial.  In spite of strong proof of first degree premeditated murder, trial counsel was able to negotiate a plea of second degree murder with a sentence that allowed the Petitioner some hope of being released from prison during his lifetime.  The Petitioner considered the offer with his family and had a night to think about it.  The Petitioner voiced no concerns at the plea hearing about the plea or trial counsel.  In short, the Petitioner has failed to demonstrate that his plea was constitutionally infirm and, therefore, the Petitioner is entitled to no relief on this basis.

*Pro Se Post-Hearing Amendment to Post-Conviction Petition*

Several months after the post-conviction evidentiary hearing, the Petitioner filed, pro se, an "amendment to petition for post-conviction relief" in which he alleged, as additional grounds for relief, that he had not been informed of the elements of first degree premeditated murder or second degree murder.  This Court has made clear that, when an appellant is represented by counsel, he may not simultaneously proceed pro se.  <u>See, e.g.</u>, <u>State v. Cleo Henderson</u>, No. W2012-01480-CCA-R3-CD, 2013 WL 6157039, at *5 (Tenn. Crim. App. Nov. 21, 2013) (citations omitted).  Accordingly, this pleading is not properly before us. Moreover, trial counsel testified that he informed the Petitioner about the elements of the crimes at issue.  The post-conviction court clearly accredited trial counsel's testimony. Accordingly, the Petitioner is entitled to no relief on this basis.

## Conclusion

For the foregoing reasons, we conclude that the Petitioner is not entitled to post-conviction relief.  Therefore, we affirm the judgment of the post-conviction court.

_____
JEFFREY S. BIVINS, JUDGE

-12-